### Richmond

## SANDRA RHEA SUNDIN, ET AL., ETC.

## v.

## J. NICK KLEIN, III, COMMITTEE, ETC.

August 28, 1980.

Record No. 790200.

Present: Carrico, Harrison, Cochran, Poff, Compton, and Thompson, JJ.

*Daniel Hartnett* (*Ayres, Hartnett & Custis,* on brief), for appellants.

*J. Nicholas Klein, III* (*Mapp & Mapp,* on brief), for appellee.

CARRICO, J., delivered the opinion of the Court.

Appealing from an adverse ruling and espousing the common law maxim that no person should be permitted to profit by his own wrong, the executrices of the estate of a murdered wife ask us to reverse the judgment appealed from and to order that a constructive trust be impressed upon land held by the wife and her slayer-husband as tenants by the entirety. This request arises against the following background:

By deed dated December 17, 1971, Marcia Lane Cross and Walter Dounton Cross, her husband, acquired as tenants by the entirety with survivorship one acre of land on Powellton Avenue in the Town of Wachapreague. On August 13, 1977, Walter shot and killed Marcia. For her death, he was convicted of second degree murder. This court refused his petition for appeal. 219 Va. lxviii (1978), *cert. denied,* 440 U.S. 937 (1979).

By will dated May 11, 1973, Marcia devised to a sister a lot on Center Street in Wachapreague and, in the residuary clause, devised and bequeathed the rest of her estate in trust for the benefit of her two children. The will was probated, and Sandra Rhea Sundin and Martha Peppler, the executrices named therein, were appointed to administer the estate. They qualified and, on April 17, 1978, filed a motion for declaratory judgment against J. Nick Klein, III, as Walter's committee.

In the motion, Marcia's executrices alleged that any interest Walter acquired in the subject land upon Marcia's death should be considered a part of her estate and disposed of according to the terms of her will. The motion concluded with a prayer that the court "adjudicate and determine the rights of the parties in and to" the subject land.

In his responsive pleading, the committee denied that Marcia's estate had any interest in the property in question. The committee alleged that Walter's interest in the land as surviving tenant "was vested . . . at the time of the purchase of said property" in 1971.

During argument of the case below, counsel for Marcia's executrices proposed that the trial court impress "a constructive trust on one half of the property" in question for the benefit of Marcia's estate. Rejecting the proposal, the court ruled in its final decree that Walter "is the sole owner in fee simple" of the subject land.

On appeal, the question for decision is whether Walter is the sole fee simple owner of the land in dispute or whether, because Walter murdered Marcia and has been convicted therefor, his rights in the property should be limited in some manner for the benefit of Marcia's estate.

■ This specific question is one of first impression in Virginia.[1] It would appear, therefore, that the way is clear for this court to consider whether a remedy exists to correct what counsel for Marcia's estate calls an "obvious wrong" and to avoid a result the same counsel terms "repugnant." Walter's committee, however, insists that a Virginia statute, Code § 64.1-18, stands in the way of such consideration. In pertinent part, the Code section provides:

> "No person shall acquire by descent or distribution or by will any interest in the estate of another, nor receive any payment under any policy of life insurance upon the life of another, for whose death such person has been convicted of murder."

Walter's committee argues, in effect, that, by this Code section, the General Assembly has preempted the field pertaining to the acquisition of property rights by homicide. Accordingly, and because the statute contains no "prohibition in the case of survivorship," the committee asserts that the courts are foreclosed from furnishing a remedy in survivorship cases.

To say this, however, suggests that the General Assembly condones the acquisition by murder of all property rights not mentioned in Code § 64.1-18. We know that such a proposition cannot be true. Indeed, we believe that Code § 64.1-18 constitutes legislative recognition of a broad public policy against the acquisition of property rights by murder. We believe further that it is the duty of this court to attempt to give effect to the pronounced public policy by fashioning a remedy to protect the specific interest at issue in this case.

■ The committee, however, interposes a warning that "there are [so] many problems to be considered in determining whether" to provide a remedy for the kind of wrong involved here that we should refrain from embarking upon the task. Among the problems, the committee asserts, are the following:

> "Should only murder be a bar or should manslaughter be a bar as well? Is a conviction a prerequisite or will a civil finding be

---

[1] Previously, we refused a petition for appeal in a case where one survivorship tenant had killed the other. *Whitehurst* v. *Whitehurst*, 220 Va. clii (1979). There, however, the offending tenant was acquitted of murder by reason of insanity.

sufficient? What heirs receive what shares? If the use of a constructive trust is provided, what shall be done with the property prior to institution of proceedings to determine the trust? What bearing does the source of funds have on the disposition of the property? Will all or only part of the property be subject to the trust?"

Because of the complexity of these problems, the committee opines, the courts are ill-equipped to deal with the task of providing a remedy in this sort of situation; the matter, therefore, should be left to the General Assembly. This was the course followed, the committee states, in *Bruce Farms* v. *Coupe,* 219 Va. 287, 247 S.E.2d 400 (1978).

*Bruce Farms* involved the question whether "the sale of a newly completed residence by a builder-vendor to the initial homeowner carries an implied warranty." 219 Va. 288, 247 S.E.2d at 401. We recognized that to answer the question affirmatively would require reversal of a common law rule of ancient vintage, *viz.,* the rule of *caveat emptor.* We also perceived that resolution of the question would involve a multitude of competing economic, cultural, and societal values. Accordingly, we said that the General Assembly, having the machinery to perform the task, should decide whether to formulate a new rule.

For this court to provide a remedy here, however, would not require the reversal of any established rule, but, instead, would permit the full play of a common law maxim of ancient vintage, *viz.,* that no person should be permitted to profit by his own wrong. Furthermore, the problems envisioned by Walter's committee may not, after all, constitute obstacles to the judicial formulation of a remedy in this case.

Here, we know that Walter Cross committed murder, not manslaughter, when he killed his wife and that he has been convicted of the greater offense in a criminal, rather than civil, proceeding. We know also that the proper court can determine from the victim's will the beneficiaries who will take her estate and what interests they will receive. We may assume safely, because there is no indication otherwise, that no disposition has been made of the land in question; so we need not concern ourselves with what should have been done with the property prior to the institution of this proceeding.

Further, we can state that the source of the funds with which the property was acquired is irrelevant to a determination in this case of the proper disposition of the land; if one spouse provides all the

funds for property conveyed to a married couple jointly, it will be presumed that the provider makes a gift to the other spouse of an undivided one-half interest in the property. *See Norris* v. *Barbour,* 188 Va. 723, 743-44, 51 S.E.2d 334, 343 (1949); *Chiles* v. *Bowyer,* 127 Va. 249, 258, 103 S.E. 619, 622 (1920). Nothing in the record disturbs application of the presumption in this case. Finally, we need not linger over the question whether all the property should be subject to a constructive trust; we have indicated earlier that Marcia's estate seeks the imposition of a trust upon only a one-half interest in the land, and Walter does not challenge this division as unreasonable, if a division is made.

In this case, therefore, we perceive no real obstacle to the judicial formulation of a remedy effectuating the public policy against a murderer profiting by his own wrong. Walter's committee, however, says that we have had two previous opportunities to hold that public policy prohibits a murderer from profiting by his crime and that, on each occasion, we permitted the wrongdoer to retain his ill-begotten gains.

The two occasions to which the committee refers are *Ward* v. *Ward,* 174 Va. 331, 6 S.E.2d 664 (1940), and *Blanks* v. *Jiggetts,* 192 Va. 337, 64 S.E.2d 809 (1951). In *Ward,* a wife had killed her husband, and the question was whether she was entitled to any part of his estate. The case involved an application of the predecessor to Code § 64.1-18, the statute then providing that "[n]o person shall acquire by descent or distribution, or by will, any interest in the estate of another whom he has killed in order to obtain such interest." 174 Va. at 333, 6 S.E.2d at 664. We held that there was "an entire lack of evidence" showing that the killing was for the purpose of obtaining the deceased's estate. 174 Va. at 335, 6 S.E.2d at 665. The case turned solely upon the application of the statute and involved no consideration of constructive trust or other equitable theory. *Ward,* therefore, is inapposite.

In the *Blanks* case, a husband and wife made a joint will whereby each left to the other for life all the property of the first to die, the survivor having the power during his or her lifetime to dispose of any of the property, with the remainder passing to their issue. The couple had one son. The mother died first, and thereafter the father made a new will leaving everything to the son. The father was murdered by the son for the admitted purpose of obtaining property the son knew had been left him by his father's will.

As in *Ward,* the statute in effect at the time of the *Blanks* decision

barred a person from acquiring by descent or distribution or by will any interest in the estate of another "whom he has killed in order to obtain such interest." 192 Va. at 342, 64 S.E.2d at 812. We held that the statute did not bar the son from taking the property there in dispute because the father had failed to exercise his *inter vivos* power of disposition and the son took, therefore, not from the father, but under the will of the mother.

In the course of the *Blanks* opinion, we cited *Welsh* v. *James,* 408 Ill. 18, 22, 95 N.E.2d 872, 873 (1950).[2] We quoted therefrom a statement that "public policy does not demand forfeiture [in the case of the murder of one joint tenant by the other], for the demands of public policy are satisfied by the proper execution of laws and the punishment of crime." 192 Va. at 342, 64 S.E.2d at 812.

Immediately after quoting this statement, however, we reiterated our view that, by the murder of his father, the son acquired no property from the father which could be denied the son by the terms of the statute as it then read. Our quotation from the *Welsh* case merely indicated that to divest the son of property he had acquired from someone other than his murder victim would work an unlawful forfeiture. Nothing in the *Blanks* opinion suggests that, if the son had acquired property as a result of the murder of his father, this court would have been unwilling to fashion a remedy to implement the public policy against allowing a person to benefit by his own wrong.

 This brings us to a major contention of Walter's committee. The contention is that, under the common law, where property was conveyed to husband and wife, they held the property as tenants by the entirety; this meant they took the entire estate as one person, and upon the death of either spouse, the whole of the estate remained in the survivor. Under this concept, the committee says, the survivor took the whole estate, not because he acquired any new interest upon the death of the other tenant, but because he took the entirety according to the terms of the original conveyance.

This same result accrues in Virginia today, the committee states, notwithstanding that Code § 55-20 abolishes survivorship in joint

---

[2] *Welsh* involved the murder of a wife by her husband, the parties owning property as joint tenants. The issue was whether a constructive trust should be imposed upon the property. The Illinois Supreme Court answered the question negatively. Only five years later, in *Bradley* v. *Fox,* 7 Ill.2d 106, 129 N.E.2d 699 (1955), the court considered "the issue anew," stated that the authorities relied on in *Welsh* did not constitute the law, and ruled that a constructive trust should be imposed upon one-half of property held jointly by a murdered wife and her slayer-husband.

tenancies and provides further that a conveyance of land to husband and wife vests each with a distinct moiety; an exception is provided in Code § 55-21, which specifies that § 55-20 "shall not apply . . . to an estate conveyed or devised to persons in their own right when it manifestly appears from the tenor of the instrument that it was intended the part of the one dying should then belong to the others." This exception, Walter's committee points out, has been construed in *Vasilion* v. *Vasilion*, 192 Va. 735, 742, 66 S.E.2d 599, 603 (1951), to mean that tenancy by the entirety exists in Virginia with all its common law incidents.

From this recitation, the committee postulates that no estate or interest passed to Walter upon Marcia's death. The committee maintains that it would be unrealistic, therefore, "to propose that a constructive trust be imposed on an interest in the wife that did not and does not exist."

We no not disagree with the committee concerning his description of the characteristics of a tenancy by the entirety or with the proposition that the tenancy can be created in Virginia with all its common law incidents. It does not follow, however, that the common law fiction that husband and wife constitute but one person can result in defeat of the equitable claims of the estate of a spouse who has been murdered by his or her cotenant in entirety. Indeed, one authority has described as "medieval" the sort of logic that would produce such a result. G. Bogert, *Trusts and Trustees* § 478, at 171 (rev. 2d ed. 1978).

■ In a tenancy by the entirety, the incidents of time, title, possession, and interest must unite. Implicit in the terms under which an entirety estate originates, therefore, is the proposition that the estate can be terminated only by the voluntary action of both tenants or the death of one as a result of a cause reasonably contemplated at the time the tenancy is created.[3]

Where one entirety tenant murders the other, the "one person" fiction must give way to the reality that, by his murderous act, the killer has destroyed the unitary nature of the entirety estate and, contrary to his implied agreement, for all practical purposes has terminated the tenancy by a cause of death not contemplated at the time of the original conveyance. While this sort of practical termination may not be sufficient to pass legal title to those claiming

---

[3] Under a Virginia statute, a tenancy by the entirety is terminated also by the final divorce of the parties, and the entirety estate is converted into a tenancy in common. Code § 20-111.

under the victim, it would justify limiting the killer's interest for their benefit. This result should obtain notwithstanding that the killer may not acquire a "new interest" upon the death of his cotenant. As the survivor, the killer enhances his own estate substantially; no longer must he share enjoyment of the tenancy property or suffer the possibility that his cotenant will outlive him and become the sole fee simple owner of the property. To allow this enhancement would permit the murderer to profit by his own crime.

But to deny the surviving tenant full ownership, the committee complains, would work a forfeiture of estate in violation of Code § 55-4.[4] The ready answer to this complaint is that the claim of the surviving tenant here is based upon his own action in derogation of law and the implicit terms of the entirety estate. In other words, one cannot suffer an unlawful forfeiture of something he has gained contrary to law or the terms of his own undertaking.

Furthermore, if an unlawful forfeiture is caused by a judicial decision limiting the interest of the murderer of a cotenant in entirety, then, obviously, Code § 64.1-18 would cause an illegal forfeiture as well. But similar statutes uniformly have been upheld on the ground that they do not deprive the murderer of any property rights, but prevent his acquisition of additional rights by unlawful and unauthorized means. *Bradley* v. *Fox, supra* note 2, 7 Ill.2d at 114, 129 N.E.2d at 704.

Does it follow, however, that, because the surviving tenant in this case has gained a substantial interest by an "obvious wrong," this court can fashion an equitable remedy to correct the wrong? We believe that the question answers itself and that the remedy lies in the imposition of a constructive trust upon the property in dispute.

> " 'Constructive trusts have been said to arise through the application of the doctrine of estoppel, or under the broad doctrine that equity regards and treats as done what in good conscience ought to be done.*** Their forms and varieties are practically without limit, being raised by courts of equity whenever it becomes necessary to prevent a failure of justice.' 39 Cyc. 169-170, and cases cited."

*Patterson's Ex'rs* v. *Patterson,* 144 Va. 113, 123, 131 S.E. 217, 220 (1926).

---

[4] Code § 55-4 reads:

"No suicide, nor attainder of felony, shall work a corruption of blood or forfeiture of estate."

Remaining is the question of the extent to which a trust should be impressed upon the property in question. Here, we borrow from two sources, (1) the proposition noted earlier that, where one tenant pays the full price for the property held in an entirety estate, it will be presumed that he makes a gift to his cotenant of an undivided one-half interest in the property, *see Norris* v. *Barbour,* 188 Va. at 743-44, 51 S.E.2d at 343, and *Chiles* v. *Bowyer,* 127 Va. at 258, 103 S.E. at 622, and (2) the effect of the rule set forth in Code § 20-111, *supra* note 2, that, when tenants by the entirety are divorced by final decree and nothing more appears than the fact of divorce, each is entitled, as a tenant in common, to an undivided one-half interest in the land formerly held in entirety. *See Jenkins* v. *Jenkins,* 211 Va. 797, 799-800, 180 S.E.2d 516, 518 (1971).

We conclude that the soundest and most equitable course to follow in this case is to impress a constructive trust upon a one-half undivided interest in the property in dispute for the benefit of Marcia's estate, to be disposed of according to the terms of her will, with Walter holding the other undivided one-half interest free of any trust. Under this disposition, Marcia's estate receives all it asks, and Walter keeps all he is due.

For the reasons assigned, the decree appealed from will be reversed and set aside. A final decree will be entered here declaring that Walter D. Cross holds as trustee under a constructive trust, for the benefit of the estate of Marcia Lane Cross, an undivided one-half interest in a lot of land on Powellton Avenue, Wachapreague, Virginia, described in a deed dated December 17, 1971, and recorded in Deed Book 313, page 340, in the Clerk's Office of the Circuit Court of Accomack County, the interest herein declared on behalf of the estate of Marcia Lane Cross to be disposed of according to the terms of her will dated May 11, 1973.

*Reversed and final decree.*[5]

---

[5] In resolving the issue in this case, we have been aided by a review of numerous decisions in other jurisdictions. We have benefited also by a review of a number of secondary authorities, namely: Annot., 42 A.L.R.3d 1116 (1972); G. Bogert, *Trusts and Trustees* § 478 (rev. 2d ed. 1978); B. Cardozo, *The Nature of the Judicial Process* 40-43 (1921); D. Dobbs, *Remedies* § 6.4, at 469 (1973); 4 J. Pomeroy, *Equity Jurisprudence* § 1054d (5th ed. 1941); *Restatement of Restitution* § 188, Comment b (1937); 5 A. Scott, *Trusts* § 493.2 (3d ed. 1967); and Comment, 14 Rich. L. Rev. 251 (1979).

From our review, it appears that a one-sided majority of the decisions and all the secondary authorities listed above support the granting of judicial relief in some form or another upon one theory or another in a situation similar to the one at bar.

Notable among the decisions granting relief are *Johansen* v. *Pelton,* 8 Cal.App.3d 625, 87 Cal. Rptr. 784 (1970), *Bradley* v. *Fox,* 7 Ill.2d 106, 129 N.E.2d 699 (1955), *Pannone* v. *McLaughlin,* 37 Md. App. 395, 377 A.2d 597 (1977), and *Grose* v. *Holland,* 357 Mo. 874, 211 S.W.2d 464 (1948).

Walter's committee relies upon seven decisions from five states as standing for the proposition that a killer's rights in survivorship property should not be limited. The five states are Colorado, Illinois, Kansas, Ohio, and Tennessee. As we demonstrated earlier, the Illinois case, *Welsh* v. *James,* 408 Ill. 18, 95 N.E.2d 872 (1950), was discredited completely, although not expressly overruled, by the later decision in *Bradley* v. *Fox,* cited in the next preceding paragraph. Further, because of a statutory change, two Kansas cases relied upon by the committee, *In re Estate of Foster,* 182 Kan. 315, 320 P.2d 855 (1958), and *In re Estate of Pyke,* 199 Kan. 1, 427 P.2d 67 (1967), were not followed in a later decision, *In re Estate of Shields,* 1 Kan. App.2d 688, 574 P.2d 229 (1977). Thus, of the five states upon whose decisions Walter's committee relies, apparently only three, Colorado, Ohio, and Tennessee remain committed to the proposition that a killer's rights in survivorship property should not be limited. *But see* Ohio Rev. Code Ann. § 2105.19 (Page 1976).